IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>IAN BRINKSMAN,<br><br>Defendant. | Case No. 1:26-MJ-423 |

**UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR DETENTION**

The defendant Ian Brinksman ("Brinksman") unlawfully transmitted national defense information to a person not entitled to receive it in violation of 18 U.S.C. § 793(d). Over the last year, on five separate occasions currently known to the government, Brinksman accessed classified intelligence from the government agency in which he worked and provided it to his girlfriend who published the material to her Substack page.[1] The government has confirmed that at least some of the material was classified at the Top-Secret level.

The seriousness of the charges creates an enormous incentive for Brinksman to flee, pass classified information, and obstruct the investigation. Brinksman's history of foreign travel, lack of ties to the community, financial means, personal and romantic relationship with the primary witness in this case ("Individual 1"), and brazen disregard for his oaths to protect the public trust

[1] Substack is an online platform that provides publishing, payment, analytics, and design infrastructure to support subscription-based content, including newsletters, podcasts, and video. It allows writers to send digital content directly to subscribers.

and safeguard classified information enhance the risks of ongoing disclosure of classified information, posing a danger to the community and increasing his risk of flight.

Because no combination of conditions will reasonably assure the safety of the community or Brinksman's presence at future proceedings, the government respectfully asks the Cout detain Brinksman pending trial.

## Procedural Background

On October 23, 2026, the FBI arrested Brinksman based on probable cause that he transmitted national defense information to Individual 1. Shortly thereafter, the Honorable William Fitzpatrick issued a criminal complaint charging Brinksman with one count of transmitting national defense information to a person not entitled to receive it, in violation of 18 U.S.C. § 793(d). That same day, Brinksman was brought before the Honorable William Fitzpatrick for an initial appearance. Brinksman's detention hearing and preliminary hearing are scheduled for October 27, 2026.

## Factual Background

Brinksman is a forty-two-year-old dual citizen of the United States and United Kingdom. Beginning in or around 2020, Brinksman worked as an employee of the Central Intelligence Agency ("CIA") based in the Eastern District of Virginia. Aff. in Supp. Of Crim. Compl. ("Aff.") ¶ 10. In or around September 2022, Brinksman began working as an employee for a third-party company ("Company 1") as a contractor with the CIA. *Id.* Brinksman worked as a developer for systems integration. *Id*. Brinksman possessed a TS/SCI[2] security clearance in connection with his work for the U.S. government. *Id*. ¶ 11.

---

[2] Sensitive Compartmented Information ("SCI") is classified information related to intelligence sources, methods, and analytical processes.

Brinksman has an ongoing personal and romantic relationship with Individual 1 who maintains an online publication on Substack.[3] *Id.* ¶ 12. Individual 1 published articles on Substack and has referred to her Substack account as "her new independent publication" for "[r]eporting on Congress, War, and political economy." *Id.* A fundraising article reportedly published by Individual 1 in September 2026 stated, "over the past year [Individual 1 has] published reporting based on classified CIA assessments that I believe the public deserves to know about." *Id.* Individual 1's social media profile shows Individual 1 commenting in a public post, "I also accept leaks." *Id.*

At all relevant times, Brinksman worked inside of a SCIF. *Id.* ¶ 13. At the CIA, Brinksman was required to wear a badge and badge in and out of both the building where he worked and the specific SCIF in which he worked. *Id.*

As a condition of his previous employment, Brinksman signed various non-disclosure agreements, to include one signed on December 18, 2025, in which Brinksman was granted access to SCI materials. *Id.* ¶ 15. This non-disclosure agreement states, "I have been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of SCI by me could cause irreparable injury to the United States or be used to the advantage by a foreign nation." *Id.* The non-disclosure agreement further cautioned that "unauthorized disclosure of SCI by me may constitute violations of United States criminal laws, including provisions of Sections 793, 794, 798, and 952." *Id.*

As another condition of his past employment, Brinksman also completed numerous training courses related to the handling of classified information. *Id.* ¶ 16. For example, Brinksman

[3] Substack is an online platform that provides publishing, payment, analytics, and design infrastructure to support subscription-based content, including newsletters, podcasts, and video. It allows writers to send digital content directly to subscribers.

completed trainings related to classification and system administrator security in March and September 2026, respectively. *Id.* Through the course of his employment, Brinksman was advised and trained on the proper handling and storage of classified information. *Id.*

In or around 2022, Brinksman requested access to a specific repository of classified intelligence ("the Classified Database"). *Id.* ¶ 17. Brinksman first accessed the Classified Database on August 11, 2022. *Id.*

On or about March 11, 2026, Individual 1 contacted Brinksman at approximately 8:41 a.m.[4] *Id.* ¶ 18. Less than an hour later that same day, Brinksman accessed records from the relevant government agency that owns the Classified Database. *Id.* Specifically, Brinksman accessed a specific classified report in the Classified Database ("Report 1"), which was marked TOP SECRET, at 9:09 a.m. and then again at 10:01 a.m. *Id.*

Brinksman exited the facility where he worked at approximately 11:15 a.m. and then re-entered the building at 11:23 a.m. and departed the facility again at 1:02 p.m. *Id.* ¶ 19. Later, on the same day at approximately 8:08 p.m., Individual 1 called Brinksman (for approximately 14 minutes). *Id.* Brinksman entered the campus of the facility where he worked at 8:16 p.m. and then entered his workspace at approximately 8:27 p.m. *Id.* He finally departed the facility at 10:01 p.m. *Id.*

On or about March 11, 2026, the same date that Brinksman accessed Report 1, Individual 1 posted an article on Substack with a similar title ("Article 1"). *Id.* ¶ 20. Article 1 contains certain content similar to Report 1, and an Original Classification Authority ("OCA") has confirmed that Article 1 contains classified information up to the TOP SECRET level that reflects the information in Report 1. *Id.*

---

[4] All call times are listed in Eastern Daylight Time ("EDT").

On or about May 12, 2026, Brinksman called Individual 1 at approximately 8:25 a.m. (for approximately 10 minutes). *Id.* ¶ 21. Later that same day, Brinksman accessed another classified report in the Classified Database ("Report 2"), which was marked TOP SECRET, at 11:26 a.m. *Id.* Brinksman exited the secure facility at approximately 12:57 p.m. *Id.* Brinksman then called Individual 1 at 1:07 p.m. (for approximately three minutes), at 4:34 p.m. (for approximately 27 minutes), at 5:04 p.m. (for approximately 10 minutes), and at 5:15 p.m. (for approximately 10 minutes). *Id.* Similar to the sequence of events on March 11, 2026, shortly thereafter, Individual 1 posted an article on or about the next day, May 13, 2026, with a similar title ("Article 2"). *Id.* Article 2 contains certain content similar to Report 2, and an OCA has confirmed that Article 2 contains classified information that reflected classified information in Report 2. *Id.*

On or about May 26, 2026, Brinksman called Individual 1 at 8:18 a.m. (for approximately 8 minutes). *Id.* ¶ 22. According to badge swipe records, Brinksman entered the government facility where he worked at 8:54 a.m. *Id.* Less than twenty minutes later, Brinksman accessed another classified report in the Classified Database ("Report 3") at 9:10 a.m. *Id.* Brinksman departed the secure facility at approximately 3:00 p.m. *Id.* Less than fifteen minutes later, Brinksman proceeded to call Individual 1 at 3:13 p.m. (for approximately 12 minutes), at 3:30 p.m. (for approximately 10 minutes), and again at 6:44 p.m. (for approximately 3 minutes). *Id.* Similar to the sequence of events on March 11 and May 12, 2026, shortly thereafter, Individual 1 posted an article on or about May 28, 2026, with a similar title ("Article 3"). *Id.* Article 3 contains certain content similar to Report 3, and an OCA has confirmed that Article 3 contains classified information that reflected classified information in Report 3. *Id.*

On or about July 28, 2026, Individual 1 called Brinksman at approximately 8:24 a.m. (for approximately 18 minutes). *Id.* ¶ 23. On that same date, Brinksman accessed a report in the

Classified Database ("Report 4"), which was marked TOP SECRET, at 10:32 a.m. *Id*. Brinksman exited the facility where he worked at approximately 11:32 a.m. *Id*. He then proceeded to call Individual 1 at approximately 11:45 a.m. (for approximately 18 minutes) and then re-entered the building at 12:19 p.m. *Id*. Brinksman called Individual 1 again at approximately 2:45 p.m. (for approximately three minutes). *Id*. Individual 1 posted an article on or about July 29, 2026, with a similar title ("Article 4"). *Id*. Article 4 contains certain content similar to that of Report 4, and an OCA has confirmed that Article 4 contains classified information that reflected classified information in Report 4. *Id*.

On or about August 24, 2026, Brinksman contacted Individual 1 at 8:29 a.m. (for approximately 22 minutes) and again at 12:16 p.m. (for approximately 45 minutes). *Id*. ¶ 24. On or about August 24, 2026, Brinksman accessed a classified report in the Classified Database ("Report 5") on two separate occasions at 2:42 p.m. and 2:49 p.m. *Id*. Brinksman contacted Individual 1 again at 5:40 p.m. (for approximately 20 minutes). *Id*.

On or about August 25, 2026, Brinksman contacted Individual 1 at 8:13 a.m. (for approximately two minutes), and then Individual 1 contacted Brinksman at 8:24 a.m. (for approximately 17 minutes). *Id.* ¶ 25. Brinksman accessed Report 5 again at 8:53 a.m. *Id*. Brinksman then contacted Individual 1 at 3:49 p.m. (for approximately 12 minutes), and Individual 1 contacted Brinksman at 4:10 p.m. (for approximately 30 minutes). *Id*.

On or about August 26, 2026, Brinksman contacted Individual 1 at 8:28 a.m. (for approximately 23 minutes). *Id*. ¶ 26. Brinksman accessed Report 5 again at 9:53 a.m. on the same day. Report 5 was marked TOP SECRET. *Id*.

On or about October 1, 2026, Individual 1 called Brinksman at approximately 8:34 a.m. (for approximately six minutes). *Id*. ¶ 27. A little over an hour later, Brinksman accessed Report 5

again in the Classified Database at 9:39 a.m. *Id*. Brinksman exited the facility where he worked at approximately 12:03 p.m. *Id*. Individual 1 called Brinksman at approximately 12:11 p.m. (for approximately 47 minutes). *Id*. Brinksman re-entered the building at 1:05 p.m. Brinksman later called Individual 1 at approximately 5:40 p.m. (for approximately 37 minutes). *Id*. Individual 1 posted an article on or about October 5, 2026, with a similar title ("Article 5"). *Id*. Article 5 contains certain content similar to that of Report 5, and an OCA has confirmed that Article 5 contains classified information that reflected classified information in Report 5. *Id*.

None of these Reports—Reports 1, 2, 3, 4, or 5—were within the scope of Brinksman's work. *Id*. ¶ 30. All five Reports have various classification markings, to include TOP SECRET markings and all the Reports include TS/SCI classification banners at the top of the Reports. *Id*. Based on a classification review conducted by the relevant equity holder, Articles 1 through 5 contain classified information. *Id*. Each of Articles 1 through 5 contained similar content lifted from Reports 1 through 5. *Id*.

Additionally, records from the relevant government agency reflect that Brinksman was one of no more than six individuals who accessed the relevant Substack page from the federal government facility between March 1 and October 5, 2026. *Id*. ¶ 31. Other than Brinksman, records from the relevant government agency reflect none of the other individuals who accessed the relevant Substack page during this time period viewed all five of the Articles and also accessed the five Reports. *Id*.

Brinksman and Individual 1 also collaborated on a separate article later posted to Individual 1's Substack account. *Id*. ¶ 33. The article related to geopolitical issues in the Middle East. Specifically, on March 13, 2026, at approximately 10:20 a.m., an email notification was generated from Individual 1 to Brinksman that a Google Document had been shared for editing. *Id*. The

Google Document had a title referencing a specific country. *Id.* At approximately 10:32 a.m., an email notification was generated from Brinksman to Individual 1 stating, "instead of ending with 'if' maybe change to 'combat operations.'" *Id.* At approximately 10:32 a.m., an email notification was generated from Individual 1 to Brinksman marked as "Resolved." *Id.* Later the same day, Individual 1 posted an article on a public website with a title referencing the same identified country. At this point, the government has not identified classified equities in this article. *Id.*

On or about November 20, 2025, prior to accessing of all of the classified reports described herein, Brinksman sent an email from his Gmail account to a friend stating, "So yeah, I'm still laying low and trying to figure out what's next (once the dust finally settles.) The lady I've been seeing is a journalist and recently went independent. So I've been helping her get that off the ground. Her venture focuses on foreign policy. So, I'm getting a surprising amount enrichment/fulfilment from working on that." *Id.* ¶ 34. Brinksman and Individual 1 are in a relationship, and Individual 1 is the individual referenced in Brinksman's November 20, 2025, email referenced above. *Id.* ¶ 35.

On October 23, 2026, agents with the Federal Bureau of Investigation executed a search warrant on Brinksman's premises, vehicle, and residence. A preliminary review of Brinksman's phone has revealed communications between Individual 1 and Brinksman directly relevant to the charged offense and the articles Individual 1 published to her Substack account that contained U.S. government classified information. For example, in a text message on or about January 20, 2026, Brinksman texted Individual 1, "I leaked while I was there" in reference to a brief period of prior employment with another government agency.

On March 13, 2026, Brinksman and Individual 1 exchanged texts about an article Individual 1 was drafting. Brinksman told Individual 1 to, "[g]o finish your article." Individual 1

responded to Brinksman stating, "wanna look at my draft real quick." Brinksman responded, "[s]ure, Looking for anything in particular as I read." Individual 1 stated, "if you see any mistakes or factual errors let me know cause I'm going kind of quick." Brinksman replied, "It's so good and easy to read and understand and I made a single grammar suggestion for you." The same day, Individual 1 posted an Article to her Substack site. Individual 1 did not post another article to her Substack page until April 27, 2026.

On October 1, 2026, Individual 1 and Brinksman discussed the upcoming publication of an article. Individual 1 was concerned about co-publishing an article and told Brinksman, "[]I'm feeling kind of protective of my work and like maybe I'd like to copublish instead? There is something psychologically (*sic*) that is bothering me a bit about giving *drop site* [emphasis added] full rights to my story. What's your honest opinion?'

Brinksman responded, telling Individual 1, "I think for this one you should co-publish [b]ecause you just launched your fundraiser [] so created a bit of momentum." After back and forth on this topic, Individual 1 stated, "I love how you level me up in every way." As of the date of this filing, the only article that Individual 1 published on her Substack account after this text message exchange was the October 5, 2026, article, referenced above, that contained U.S. government classified information. Additionally, the byline of this article stated, "This article was co-published with *drop site news*" [emphasis added]. On October 5, 2026, Individual 1 texted Brinksman stating, "They're going to publish later this afternoon." Brinksman responded, "[p]erfect time for endorphin hit."

The government is in possession of other messages where Brinksman and Individual 1 collaborated and discussed the articles posted to Individual 1's Substack account, including those referenced herein that contained U.S. government classified information.

**The Bail Reform Act of 1984 – 18 U.S.C. § 3142**

Pursuant to 18 U.S.C. § 3142(a), when a defendant is arrested, the Court, in relevant part, shall issue an order that, pending trial, the person be (1) released on personal recognizance; (2) released on a condition or a combination of conditions; or (3) detained under subsection (e)." Detaining a defendant under Section 3142(e) requires a hearing "pursuant to the provisions of subsection (f)." *Id.* at § 3142(e). In turn, as relevant here, subsection (f)(2) authorizes detention where there is: (1) "a serious risk that such person will flee;" or "a serious risk that such person will obstruct or attempt to obstruct justice."

If detention is authorized, pursuant to Section 3142(g), the Court must consider whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. "Subsection (g) sets out the factors that a judicial officer considers in its pretrial detention decision: (1) 'the nature and circumstances of the offense charged,' (2) 'the weight of the evidence against the [defendant],' (3) 'the history and characteristics of the [defendant],' and (4) 'the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release.'" *United States v. Vane*, 117 F.4th 244, 250 (4th Cir. 2024) (quoting 18 U.S.C. § 3142(g)(1)–(4)).

Section 3142 "entitles the government to make evidentiary proffers during detention hearings." *Vane*, 117 F.4th at 252. Ultimately, the government's burden of persuasion is "to show by clear and convincing evidence that the defendant is dangerous or by a preponderance of the evidence that he's a flight risk." *Id.* at 251. "For pretrial detention to be imposed on a defendant, the lack of reasonable assurance of either the defendant's appearance or the safety of others or the community, is sufficient; both are not required." *United States v. Stewart*, 19 F. App'x 46, 48–49 (4th Cir. 2001) (citing *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir.1992)).

## Argument

Brinksman had access to some of our nation's most sensitive secrets. The fact that he broke his oath to protect and safeguard our nation's secrets demonstrates that Brinksman is a serious danger to the community and a serious flight risk. Upon release he will be able to amplify the harm he has already caused by further disclosing classified information he retains or recalls. Brinksman also has the means and motivation to flee. Equally concerning is Brinksman's romantic relationship with Individual 1—a primary witness in this case—and the real risk of obstruction this relationship poses. No condition or combination of conditions can ensure the safety of the community and mitigate the risk of obstruction and ensure Brinksman's presence at court proceedings.

### I. Brinksman Poses a Danger to the Community.

Brinksman worked as a CIA operations officer and then as a CIA contractor—both positions required a TS/SCI clearance. As such, he had access to our nation's most closely guarded secrets and further disclosure of that information would harm the community. This danger, under the Bail Reform Act, is not limited to physical violence and includes continued criminal activity that poses a danger to the public at large. *See* S. Rep. No. 98-225, 98th Cong., 1st Sess. 12 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3195 ("[T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."); *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("Danger, in this context, was not meant to refer only to the risk of physical violence.").

Furthermore, the Supreme Court has unequivocally held that protecting the secrets that

contribute to the U.S. national security is vital. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is 'obvious and unarguable' that *no governmental interest is more compelling* than the security of the Nation.") (emphasis added). More particularly, "'[t]he Government has a substantial interest in protecting sensitive sources and methods of gathering information,'" *United States v. Abu Ali*, 528 F.3d 210, 247 (4th Cir. 2008) (quoting *United States v. Smith*, 780 F.2d 1102, 1108 (4th Cir. 1985)), and in "protecting both the secrecy of information to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.'" *Abu Ali*, 528 F.3D at 247 (quoting *CIA v. Sims*, 471 U.S. 159, 175 (1985)); *see also U.S. v. Mallory*, 268 F. Supp. 3d 854, 866 (E.D. Va. 2017) (finding that defendant charged with the "serious offence" of espionage was a danger to the community because his disclosure of classified intelligence 'posed[d] a grave risk of endangering not only one person, but the U.S. itself."); *United States v. Gun*, 1:2-mj-00325-IDD-1, Doc. At 42 (Sept. 10, 2024) (ordering detention of defendant charged with unauthorized removal and retention of classified information in part because "there is a grave risk of danger based on the materials that were taken, the defendant's education and background, and his capacity to pass that information on if he chose to do so."); *United States v. Reality Winner*, 1:17-cr-00024, Doc. 163 at 14 ("[T]he Court finds that releasing Defendant prior to trial would pose a danger to the community, particular to the national security."). In rejecting release conditions to include restrictions on contact with the media and restrictions on internet usage, the court in *Winner* elaborated, "Classified information cannot be retrieved or un-disclosed once it is released, so the potential harm to national security is too great a risk to place upon the promises of this Defendant." *Id.* at 16.

If released pending trial, Brinksman poses a continued danger to the community. He holds a wealth of classified knowledge, including personal information of those employed by the

relevant government agency. Brinksman has been fired from his job and is facing up to ten years in prison. If pressed, and in order to ensure a supply of money and refuge from prosecution, Brinksman would be able to leverage his knowledge of classified information as currency. Given the charged conduct, it is foreseeable that Brinksman would transmit classified information that he recalls to a foreign adversary or anyone else who would have interest in learning the U.S. government's secrets in exchange for providing the Brinksman benefits, such as money or travel to flee prosecution. This harm is even more acute given that Brinksman served as a CIA operations officer, in which he worked and interacted with numerous covert officers. If he chose to reveal the names or identities of those officers, doing so could expose human sources who interacted with those officers. Any continuing criminal threat to national security interests logically must fall within the purview of the Bail Reform Act, and in this case that threat is clear and serious.

## II. Brinksman Poses a Significant Flight Risk.

### A. History and Characteristics of Brinksman.

The "history and characteristics" of Brinksman weigh in favor of detention. *See* 18 U.S.C. § 3142(g)(3). As noted above, Brinksman would be a valuable asset to the intelligence service of a foreign nation and adversary. Prior to becoming a CIA contractor, Brinksman trained as an operational CIA staff officer. While he was ultimately not successful at certifying as a CIA staff officer, he underwent rigorous and intense training for CIA operational officers, which included training in surveillance detection. Such a skillset only further undermines the risk of flight posed by Brinksman's release. Brinksman is also well-educated and well-traveled. He has ties and citizenship in the United Kingdon. All of this, coupled with his extensive foreign travel to include recent travel to Turkey and Mexico, and his foreign citizenship, show that Brinksman has ample reason and ability to flee prosecution. *See United States v. Martin*, 17-cr-00069, Doc. 24 (detaining

defendant charged with removal of classified information under § 1924 in part because he is "highly intelligent and capable of flight").

**B. Weight of the Evidence**

The "weight of the evidence" militates in favor of detention. *See* 18 U.S.C. § 3142(g)(2). Brinksman faces a charge of unlawful transmission of national defense information, which carries a ten-year maximum penalty. 18 U.S.C. § 793. The evidence shows a chronology repeated multiple times: (1) Brinksman accessed classified information to which he had no need to know; (2) he then called Individual 1 in short order after accessing the reports; and (3) Individual 1 then posted articles on her webpage that contained the information Brinksman accessed in the hours, days, or weeks prior. The FBI also continues to review dozens of communications between Brinksman and Individual 1, which show Brinksman's active participation in working with Individual 1 to edit her articles to further the reach of Individual 1's audience. In other communications with Individual 1, Brinksman admits that he "leaked" while working for his prior employer. He states, "I didn't have a clearance so I didn't show any secrets so I am comfortable saying this on text." These messages only further corroborate the modus operandi of Brinksman sending Individual 1 classified information. As FBI continues its review, the evidence will expand, only furthering the risk that Brinksman will flee. *See United States v. Mallory*, 268 F. Supp. 3d 854, 863-64 (E.D. Va. 2017) (finding, in a case brought under 18 U.S.C. § 794(a), that "the weight of the evidence against defendant is significant and substantial and thus increases the risk that the defendant will flee").

**C. Nature and Circumstances of the Offense**

The "nature and circumstances of the offense" are of grave concern and support the finding that Brinksman is a serious flight risk. *United States v. Reality Winner*, 1:17-cr-00024, Doc. 163 at 5-6 (affirming decision to detain the defendant charged with one count of transmission of national defense information and noting that the "gravity of Defendant's allege crime is

unassailable.")

Brinksman signed his name to various agreements acknowledging that he understood the seriousness of his security clearance and the potential irreparable injury to the United States that unauthorized disclosure of classified materials could cause. Despite this, Brinksman used his training and position to access classified documents and then share information from those reports, fully aware they would be made public. A review of Brinksman's electronic devices and other evidence is in its nascent stage, and the evidence continues to grow. It remains possible that Brinksman violated his oath to protect classified information in even more ways than what is alleged in the complaint, further compounding the ongoing threat Brinksman poses. "[D]ocuments that the government has not recovered could do great harm to the community by threatening national security." *U.S. v. Teixeira*, 23-cr-10159-IT, Doc. 103 at 11 (rejecting defendant's request to revoke detention order after being arrested on charges of willful retention and transmission of national defense information).

The fact is that Brinksman still possesses classified information that could cause grave harm to the United States if revealed. Brinksman may seek the protection of a foreign government—either through flight from the U.S. or refuge in an embassy—in order to avoid this prosecution.

**III. No Condition or Combination of Conditions Can Reasonably Mitigate These Risks.**

Even the most stringent of pretrial conditions cannot mitigate the risk posed by Brinksman. Prohibiting or severely restricting the defendant's use of or access to the internet is "notoriously difficult to enforce." *See United States v. Ojo*, 2020 WL 7707341, at *2 (D. Md. Dec. 29, 2020). This is particularly true in an age where most televisions are internet capable and where wireless access is often available from areas surrounding one's residence, even if a home's internet

subscription is discontinued. *See United States v. Reiner*, 468 F. Supp. 2d 393, 399 (E.D.N.Y. 2006) ("Even if the Court were to order electronic monitoring and home detention of the defendant pending trial, that condition would not adequately address his ability to access phones or computers in his home which could be used for the types of illicit activities described above, even if steps were taken to try to prevent those items from being present or available in the house. In this day and age, with devices such as cellphones, Blackberries, and laptops, there are no conditions which can reasonably assure the safety of the community under the particular circumstances of this case if the defendant is released on bail.").

Further, the Court should look no further than the conduct alleged in the Complaint as evidence of Brinksman's willingness to violate clear directives. Brinksman violated his oath and has demonstrated an inability to abide by his agreement with the government. Brinksman's pattern of conduct shows a disregard for the rules imposed upon him by his former employment and demonstrates that he is willing to break this agreement when it suits him. Based on his past conduct, the government does not believe Brinksman will follow the Court's order regarding pretrial conditions of release and thus detention is appropriate.

## Conclusion

For the foregoing reasons, the United States respectfully moves to detain Brinksman pending trial.

Respectfully submitted,

Todd Blanche
Attorney General

_____/s/______________________________
Vito Iaia
Assistant United States Attorney
U.S. Attorney's Office, EDVA
2100 Jamieson Avenue
Alexandria, VA 22314
(703) XXX-XXXX
Vito.Iaia@usdoj.gov

JOHN A. EISENBERG
Assistant Attorney General for National Security

By: */s/ Eli J. Ross*
Trial Attorney
IL Bar No. 6321411
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
Telephone: 202-616-5447
Eli.Ross2@usdoj.gov

By: */s/ Kathryn DeMarco*
Trial Attorney
FL Bar No. 100210
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
Telephone: 202-616-2612
Kathryn.DeMarco@usdoj.gov